# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL HAMMOND, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 3:12-CV-00242 |
| v. | : | |
| | : | (Judge Mariani) |
| B.A. BLEDSOE, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

## I.    Introduction

Plaintiff Michael Hammond ("Plaintiff" or "Hammond"), an inmate presently confined at the United States Penitentiary in Florence, Colorado ("USP Florence")[1], initiated the above action *pro se* by filing a *Bivens*[2] civil rights Complaint under the provisions of 28 U.S.C. § 1331. (Doc. 1). Hammond raises allegations against various members of the staff at the United States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg") regarding his medical care, unsafe conditions, failure to protect, the use of excessive force, and retaliation.[3] (*Id.*).

---

[1] On June 20, 2013, Hammond informed the Court that he was transferred to USP Florence.

[2] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388 (1971). *Bivens* actions are the federal counterpart to § 1983 claims brought against state officials. *Egervary v. Young,* 366 F. 3d 238, 246 (3d Cir. 2004) (*citing Brown v. Philip Morris Inc.,* 250 F.3d 789, 800 (3d Cir. 2001)). "[C]ourts have generally relied upon the principles developed in the case law applying to section 1983 to establish the outer perimeters of a *Bivens* claim against federal officials." *Schrob v. Catterson,* 948 F.2d 1402, 1409 (3d Cir. 1991).

[3] The following Defendants remain a part of this action: B.A. Bledsoe, Warden; Associate Warden K. Bahre[3]; Health Services Administrator Brown; Clinical Director K. Pigos; Health Care Provider F. Fasciana; Unit Manager D. Brewer; Correctional Officer M. Hess; Correctional Officer L. Yohe; Staff Psychologist K. Cannon; and Staff Nurse W. Brenneman[3]. (Doc. 1, p. 1, 2).

Presently before the Court is Defendants' Motion for Summary Judgment. (Doc. 32). For the reasons set forth herein, Defendants' motion will be granted. Additionally, the motion for protective order filed by Plaintiff on April 17, 2013 (Doc. 61) will be dismissed as moot and the motion for emergency temporary restraining order (Doc. 72), filed on October 1, 2013, will be denied.

## II. Procedural Background

Plaintiff initiated this action on February 8, 2012 by filing his *pro se* Complaint. (Doc. 1). On February 10, 2012, the Court issued an Order granting Plaintiff's motion for leave to proceed *in forma pauperis* and directing service of the Complaint on the Defendants. (Doc. 6).

On February 29, 2012, Plaintiff filed a Motion for Emergency Temporary Restraining Order. (Doc. 9). Defendants' filed a brief in opposition to the motion on March 15, 2012. (Doc. 14). On May 21, 2012, Plaintiff filed a brief in support of his motion for temporary restraining order. (Doc. 26). This motion was denied on June 15, 2012. (*See* Docs. 29, 30).

Plaintiff filed motions for appointment of counsel and to issue subpoenas (Docs. 37, 39), which were denied. (Docs. 38, 41). On September 24, 2012, Plaintiff filed a motion to obtain original documents, which was granted on September 26, 2012. (Docs. 42, 43).

Plaintiff additionally filed a motion to dismiss certain parties, which was granted on October 22, 2012.[4] (Docs. 46, 47).

On October 31, 2012, Plaintiff filed a motion for protection. (Doc. 49). Plaintiff filed his brief in support on November 16, 2012. (Doc. 54). Plaintiff filed two additional motions for protective orders on December 28, 2012 and February 22, 2013. (Docs. 56, 57). These motions were stricken from the record due to Plaintiff's failure to comply with Rule 5, without prejudice, to a later consideration of these motions once they were properly served on opposing counsel. (Doc. 60). On April 17, 2013, Plaintiff filed another motion for protective order. (Doc. 61). Plaintiff filed his supporting brief on April 25, 2013. (Doc. 64). Plaintiff filed a motion to seeking leave to serve Defendants via the Electronic Case Filing system, which was granted. (Docs. 62, 66).

Additionally, Plaintiff filed a change of address (Doc. 67), a motion to receive legal documents (Doc. 68), and a request to disregard the motion to receive legal documents (Doc. 69). Plaintiff's motion to receive legal documents was deemed withdrawn and dismissed. (Doc. 70). On October 1, 2013, Plaintiff filed a motion for emergency temporary restraining order. (Doc. 72).

Defendants filed the current motion for summary judgment on July 23, 2012. (Doc. 32). Defendants filed a brief in support of their motion and a Statement of Facts on August 18, 2012. (Docs. 35, 36). After asking for and being granted an extension of time, Plaintiff

---

[4] The order dismissed Defendants J. Hemphill, E. Eroh, and R. Raup and terminated these Defendants as

filed his brief in opposition to the motion for summary judgment, along with his statement of

facts, on October 18, 2012. (Docs. 40, 41, 44, 45). On November 5, 2012, Defendants filed

a reply brief in support of their motion for summary judgment. (Doc. 52).

## II.    Statement of Facts[5]

Hammond first arrived at USP Lewisburg on February 8, 2011. (Doc. 36, ¶ 9).

Hammond's Complaint alleges various claims that occurred while he was at USP

Lewisburg. (See Doc. 1). Specifically, he claims that (A) Defendants have been

deliberately indifferent to his medical needs; (B) that his cell at USP Lewisburg was unsafe;

(C) that Defendants have failed to protect Plaintiff from assaults; (D) excessive use of force;

and (E) retaliation.[6]

## A.    Facts Regarding Defendants' Deliberate Indifference to Plaintiff's Medical

## Needs

---

parties to this action. (Doc. 47).

[5] Defendants filed their Statement of Facts on August 15, 2012. (Doc. 36). Plaintiff filed a document
entitled "Statement of Material Facts" on October 18, 2012. (Doc. 45). Defendants point out that Plaintiff has failed
comply with the Local Rules of the Middle District of Pennsylvania when filing his "Statement of Material Facts."
(Doc. 52, p. 2; See M.D. Pa. L.R. 56). As such, Defendants argue that their facts should be admitted. (Id.). In
considering Plaintiff's opposition brief and his document entitled "Statement of Material Facts," we agree that Plaintiff
has not complied with the Local Rules. However, Plaintiff addresses the facts throughout his brief in opposition and
in his "Statement of Material Facts." The Court notes that as a pro se litigant, Plaintiff is entitled to liberal
construction of his pleadings. As such, we will deem Defendants' Statement of Facts as admitted only to the extent
that they are not disputed by Plaintiff's assertions of fact in his brief in opposition and his Statement of Material Facts.
We will, for the purposes of summary judgment and noting Plaintiff's pro se status, consider Plaintiff's account of the
facts in determining whether any genuine issue of material fact exists which would preclude summary judgment.

[6] It appears from Plaintiff's filings that his retaliation claim is two-fold. First, he alleges that the medical
Defendants have withheld his medicine because he complained about his treatment. Second, he alleges that the
correctional Defendants assaulted him because of his complaints. Because these claims are inclusive of other
claims, we will not separately address them.

Defendant Pigos, as the clinical director, serves as the primary physician for "a full scope and range of medical services" provided to the inmates as USP Lewisburg. (Defendants' Stmt of Mat., Facts, Doc. 36, ¶ 44). Defendant Pigos, as the clinic director, also serves as the clinical supervisor for the physician assistants at USP Lewisburg. (Id. at 45). As part of the duties as clinic director, Defendant Pigos "is required to review at least two health records, per physician assistant, of the patients evaluated by the day shift clinical staff (normal work week) at the end of each workday." (Id. at 46). The clinic director also provides inmates with their chronic care clinic evaluations, which involves the clinical director personally seeing each inmate approximately every nine (9) to twelve (12) months. (Id. at 47).

Defendant Pigos saw Hammond on February 6, 2011, for a diabetic chronic care clinic. (Id. at 48). During that clinic, it was noted that Hammond "stated that he had no problems or concerns except for increased pain in his lower extremities." (Id. at 49). After this visit, Hammond was seen by mid-level providers for different reasons, including his diabetes. (Id. at 50). All orders written by these mid-level providers were reviewed and signed by Defendant Pigos. (Id. at 51). Hammond was additionally seen by a contract physician, Dr. Lee, on November 2, 2011 for Hammond's chronic care clinic. (Id. at 52).

A health screen was performed on Hammond on February 8, 2011, where it was noted that he was diabetic and insulin dependent. (Id. at 81). At this time, medication orders were written, including medications for pain and diabetes. (Id. at 82). The health

5

screen also noted that Hammond *had* a glucose meter[7] for checking his blood sugar levels. (*Id.*) (emphasis added). As of February 8, 2011, a list of active medications reflected that Hammond was being prescribed medication for pain and diabetes, included, but not limited to, acetaminophen (for pain); Ibuprofen (for pain); Glyburide (for pain); Gabapentin (pain); Metformin (diabetes); Meloxicam (pain); and Insulin injections (diabetes). (*Id.* at 83-84). An administrative note dated February 9, 2011, reflected that Hammond told a provider that "he did not want to take any of his pill line medications and that he would take his insulin, but did not want his sliding scale."[8] (*Id.* at 85).

Defendant Fasciana, a physician assistant, provided medical care to Hammond at USP Lewisburg. (*Id.* at 57-71). An administrative note dated February 9, 2011 reflects that Defendant Fasciana adjusted Hammond's medication for Gabapentin.[9] (*Id.* at 57). Defendant Fasciana also performed a medication renewal for Hammond on March 10, 2011. (*Id.* at 58).

---

[7] Plaintiff alleges that he never received a blood glucose meter on February 8, 2011. (Doc. 44, p. 8). Defendants' medical records note that he obtained one, however, it does not note when he received one. (Doc. 35, Ex. 35-3, Att. A). We emphasize that the medical records of Defendant Pigos only show that he had one on February 8, 2011, not that he received one February 8, 2011.

Additionally, attached to Plaintiff's Statement of Material Facts in Opposition to Defendants' Statement of Material Facts, there is signed paperwork entitled "Inmate Instructions and Agreement" explaining that Hammond had been authorized a glucose meter. Plaintiff also has an inmate request to staff dated September 10, 2012 asking when the glucose meter was issued to him, explaining that he may need a new one. There is writing on the request explaining that his glucose meter was issued December 29, 2011, though it appears as if the date December 29, 2012 was initially written. Given the date of the request, the 2011 date appears to be the accurate date.

[8] "On February 21, 2011, several medications (including Gabapentin) were discontinued for noncompliance." (Doc. 36, ¶ 88). "Hammond was placed back on Gabapentin on March 1, 2011, restricted to pill line access only." (*Id.* at 89).

[9] Gabapentin was used to treat polyneuropathy related to Hammond's diabetes. (Doc. 36, ¶ 57).

6

Defendant Fasciana saw Hammond on May 5, 2011 for complaints related to his diabetes. (*Id.* at 59). It was noted that Hammond wanted to change his medication for pain and the dosage of his Gabapentin was increased. (*Id.*). It was also noted that Hammond had complaints of pain. (*Id.* at 60). Defendant Fasciana wrote a prescription for Gabapentin and the order was co-signed by Defendant Pigos. (*Id.*).

Defendant Fasciana again saw Hammond on June 30, 2011 for sick call triage. (*Id.* at 61). Hammond requested compression stockings at this time, but they were not issued. (*Id.*). The medical record noted that Hammond did not have the documented history of varicose veins to support issuing the stockings to him. (*Id.* at 62; Doc. 35, Ex. 35-2, Att. I).

An administrative note shows that on July 12, 2011, while going to recreation, Hammond asked Defendant Fasciana if he could be placed back on self-carry medication.[10] (Doc. 36, ¶ 63). Hammond was advised to discuss his pill line concerns with the clinical director at his next clinic appointment. (*Id.*).

Hammond was again seen by Defendant Fasciana for sick call triage on August 3, 2011. (*Id.* at 64). Hammond requested to be put back on Wellbutrin, a psychotropic medication, at this time.[11] (*Id.*). "It was noted that Hammond did not appear anxious,

---

[10] "An administrative note dated February 14, 2011, indicated Hammond's supply of self-carry medications were not re-issuable because Hammond trashed his cell." (Doc. 36, ¶ 86). "However, it was also noted that Acetaminophen, aspirin, metformin, lisinopril, and hydrochlorothiazide would be issued as a seven day self-carry supply." (*Id.* at 87).
[11] Plaintiff notes that he has a serious medical history of mental illness. While Plaintiff names Staff Psychologist Cannon as a Defendant and complains about his medical treatment for his psychological issues in his brief in opposition, the only factual allegations (beyond a brief mention that his is not a threat to himself or others running the institution and a reference that he only attempted suicide to get away from his allegedly dangerous cellmate) in his Complaint that concern his medical treatment discuss his treatment for diabetes and neuropathy.

7

depressed, or psychotic and he was advised to express his concern at the next chronic care clinic." (*Id.* at 65).

Hammond was issued eyeglasses by Defendant Fasciana on August 3, 2011. (*Id.* at 66). Defendant Fasciana renewed medication for Harnmond on August 18, 2011. (*Id.* at 67). He also ordered lab tests and adjusted Hammond's medication on August 29, 2011. (*Id.* at 68). On September 28, 2011, Defendant Fasciana refilled an ointment for Hammond. (*Id.* at 69). On January 12, 2012, Hammond requested a housing change and he was advised to speak with Unit Team for cell assignments. (*Id.* at 70). Additionally, on February 10, 2012, Defendant Fasciana did a restraint check on Hammond and noted no medical concerns. (*Id.* at 71).

Hammond states that on or about October 15, 2011, he was experiencing high blood sugar and asked Defendant Brenneman if he could check his blood sugar. Hammond then states that Defendant Brenneman said "are you fuck (sic) crazy or something. ...I almost never that thing (sic) this time of morning so don't ask." (Doc. 44, p. 15-16[12]). Hammond then asked for "coverage"[13] because his blood sugar was so high and Defendant Brenneman responded "I don't have time for this shit (sic) and walked away from Plaintiff assign cell." (*Id.* at 16).

---

However, we note that as discussed below, Plaintiff has failed to exhaust his administrative remedies in regards to his medical claims and the record shows he is receiving medical treatment.

[12] The Court notes that it is using Plaintiff's hand-written page numbers when referencing Document No. 44.

[13] Plaintiff explains by "coverage" he means insulin.

An administrative note dated August 20, 2011 reflects that the range officer caught Hammond trying to "fishline" his Gabapentin medication to other inmates so the medication was discontinued at that time. (Doc. 36, ¶ 90). Administrative notes dated September 27, 2011 and October 26, 2011 reflect that Hammond's medications were re-filled, but to be administered on pill line only. (*Id.* at 91-92).

Hammond was seen for his chronic care diabetic clinic on November 2, 2011. (*Id.* at 93). "A clinical encounter note dated November 4, 2011, indicates that Hammond's pain medication (Gabapentin) was changed due to his improper disbursement to other inmates." (*Id.* at 94). Meloxicam was found to be a suitable substitute and was substituted for pain. (*Id.* at 95).

## B. Facts Regarding Unsafe Conditions at USP Lewisburg

Hammond states that he noticed blood on his sheet from a cut on his foot. (Doc. 44, p. 12). He presumes to have gotten this injury on his foot from a nail that was sticking up from the floor after lockers were removed by the Bureau of Prisons ("BOP"). (*Id.*). Because Plaintiff has neuropathy, he was unable to feel the nail cut his foot. (*Id.*). He argues that this was an unsafe condition. (*Id.*). He notes that, as a diabetic, an injury to his foot could have easily gotten infected and that his foot may have ultimately needed to be amputated. (*Id.*). However, he does not allege that the cut on his foot did in fact get infected, nor does

he allege that any of his limbs have been amputated. He says that he informed Defendants of the cut on his foot, and that they did not respond.[14]

Defendants note that, at some point, lockers were removed from the cells because inmates were using portions of the lockers to make weapons. (Doc. 36, ¶ 96). "Hammond's medical records were reviewed from August 2011 through December 2011, and no records were found to indicate that Hammond sought medical care for his feet related to a nail or like object causing injury to his feet." (*Id.* at 97). However, Plaintiff did attach an informal resolution attempt to his Complaint wherein he explains that he got an injury on his foot from the nail, and that he told Defendant Fasciana about it, but Defendant Fasciana refused to look at his foot.

## C.    Facts Regarding Defendants' Failure to Protect Plaintiff[15]

On June 19, 2011, an investigation was conducted because Hammond claimed he was sexually assaulted by his cell mate. (*Id.* at 36). Sexual assault protocol was initiated and the Special Investigative Agent, Psychology, and Health Services were notified. (*Id.* at 37). "The investigation revealed that neither inmate sustained any injuries and the matter was further investigated by the Special Investigative Services Department." (*Id.* at 38). According to Defendants, the "report of incident documents related to Hammond's allegation of sexual assault occurring on June 19, 2011, reveal [Defendants Brewer, Hess, Yohe,

---

[14] There is nothing in the record to suggest Plaintiff has exhausted this claim using the entire BOP exhaustion procedure.
[15] The Court notes that Defendants addressed the allegations of this claim in their excessive force section, though it appears to be more appropriately construed as a failure to protect claim. (*See* Doc. 35, p. 12-16).

10

Eroh, and Raup] had no personal involvement with such allegation or investigation of such allegation." (Id. at 77, 78).

Hammond states that this sexual assault could have been and should have been prevented. (Doc. 44, p. 20). He claims that Defendants Brewer, Hess, and Yohe failed to screen the inmates placed in his cell, which allegedly put Hammond's safety in danger. (Id.). Plaintiff explains that he was initially housed with Inmate Tariq Vaugh. (Id. at 21). He states that Vaugh gave Defendant Brewer an inmate request for a cell re-assignment due to personal differences between himself and Hammond. (Id.). Hammond claims Vaugh had wanted to move from the cell because he had raped Hammond and he was afraid Hammond would tell prison officials. (Id.).

Vaugh was subsequently moved from the cell and Hammond then became cellmate with inmate Aubrey Parks. Hammond noted that prison officials were attempting to move Parks and to separate him from another inmate with whom he had had an altercation at another institution.

Hammond explains that Parks became very aggressive. (Id.). Hammond states that Parks is known in the institution as a "gunner" or "jacker," "someone who jack off on female staff." (sic) (Id.). Hammond also claims that Parks would stand over him while he was asleep and "jack off over top of Plaintiff." (Id.). Hammond explains that Parks would make him touch his penis, make him perform oral sex, and make Hammond take off his clothes. (Id.).

11

Plaintiff says that he has given Defendant Brewer a number of inmate requests in regards to Parks' sexual advances and assaults on Hammond. (*Id.*). "For about eight weeks [Hammond's] cry for help was ignor." (sic) (*Id.*). When Hammond talked to Defendants Hess and Yohe about Parks' assaults, Defendant Hess suggested that Hammond hit Parks "upside the head when [Parks] is still in restraint, I bet he'll never do that shit again," (sic) and Defendant Yohe said he was going to talk to Defendant Brewer. (*Id.*). He alleges that Defendant Yohe never came back that day. (*Id.*).

Plaintiff claims he attempted to get help from Defendant Bledsoe by sending a number of inmate requests in regard to the number of sexual assaults he received from Parks and Vaugh. (*Id.* at 23). Plaintiff states that he had given Defendants Brewer, Hess, and Yohe a number of inmate requests with regard to the sexual assaults. (*Id.*). Plaintiff eventually, feeling that he had no other choice, told staff that he was going to kill himself to get out of the cell. (*Id.*).

## D.    Facts Regarding Excessive Use of Force

According to Defendants, on November 7, 2011, Hammond became combative while being escorted by staff. (Doc. 36, ¶ 39). "Hammond attempted to assault staff and an immediate use of force was used to regain control of him." (*Id.* at 40). Defendant Bledsoe authorized Hammond to be placed in ambulatory restraints until a pattern of compliance was gained. (*Id.* at 41). Hammond was in these restraints for approximately twenty-four

(24) hours. (*Id.* at 42). "The after action review concluded that the use of force and restraints were reasonable and appropriate." (*Id.* at 43).

Hammond states that on November 7, 2011, he was also housed with a hostile cellmate. (*Id.*). Hammond explains that while he was being escorted by Officer Ermert[16] he asked to see a lieutenant because he "was not going back in the cell with inmate Ritman Auliyy." (*Id.*). "As soon as Lieutenant P. Carrasquillo[17] saw that it was [Hammond] Lieutenant P. Carrasquillo immediately said who rape you this time whoever it is you going back in that cell and order the escorting officer Ermert to take [Hammond] back to his assign cell." (*Id.*). Hammond explains that that is when he went limp." (*Id.* at 24).

## III. Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." Fed. R. Civ. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[16] Officer Ermert is not a named Defendant in this action.
[17] Lieutenant P. Carrasquillo, although mentioned in the body of the Complaint, was not a named as Defendant in this action by Plaintiff. (*See* Doc. 1).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). Once such a showing has been made, the non-moving party must offer specific

facts contradicting those averred by the movant to establish a genuine issue of material fact.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Inferences should be drawn in the

light most favorable to the non-moving party, and where the non-moving party's evidence

contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW,*

*Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied 507 U.S. 912,

113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

## IV.    Discussion

## A.    Exhaustion

The Prison Litigation Reform Act ("PLRA") requires inmates to present their claims

through an administrative grievance process before filing suit in federal court. Specifically,

section 1997e(a) of Title 42 of the United States Code provides that "[n]o action shall be

brought with respect to prison conditions under section 1983 of this title, or any other

Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted." This "exhaustion requirement

applies to all inmate suits about prison life, whether they involve general circumstances or

particular episodes, and whether they allege excessive force or some other wrong." *Porter*

*v. Nussle*, 534 U.S. 516, 532 (2002). "'[I]t is beyond the power of this court—or any other—

to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.'" *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir.2000) (*quoting Beeson v. Fishkill Corr. Facility*, 28 F.Supp.2d 884, 894–95 (S.D.N.Y.1998) (*citing Weinberger v. Salfi*, 422 U.S. 749, 766 (1975)). The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement." *Nyhuis*, 204 F.3d at 71. The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 92 (2006).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id*. at 90–91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek [ ] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Id*. at 93 (*quoting Porter*, 534 U.S. at 525). Failure to comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. *Spruill v. Gillis*, 372 F.3d 218, 227–32 (3d Cir.2004) ("[P]rison grievance procedures supply the yardstick for measuring procedural default.") A procedural default, "either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim." *Gallego v. United States*, 2005 WL 1653166, *2 (M.D.Pa. 2005).

The Defendants explain that the BOP has established a three-tiered system whereby a prisoner may seek formal review of any aspect of his imprisonment. (Doc. 36, ¶ 1). "First, 'an inmate ... shall present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy.'" (*Id.* at 2 *quoting* 28 C.F.R. § 542.13(a)). If an inmate is unable to informally resolve his complaint, "he may file 'a formal written Administrative Remedy Request, on the appropriate form (BP-9), [within] 20 calendar days following the date on which the bases for the Request occurred.'" (*Id.* at 3 *quoting* § 542.14(a)). The Warden has twenty (20) days in which to respond to the inmate's written Administrative Remedy Request. (*Id.* at 4). "An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within [twenty (20)] calendar days of the date the Warden signed the [BP-9] response." (*Id.* at 5 *quoting* § 542.15(a)). If an inmate is not satisfied with the Regional Director's response, he or she may appeal on the appropriate form (BP-11) to the General Counsel within thirty (30) days from the date the Regional Director signed the response. (*Id.* at 6). The Regional Director has thirty (30) days to respond and the General Counsel has forty (40) days to respond. (*Id.* at 7). The administrative remedy process is not considered to have been exhausted until an inmate's final appeal is denied by the General Counsel. (*Id.* at 8).

Defendants searched the Sentry administrative remedy history from February 1, 2011 through April 3, 2012. (*Id.* at 9). It showed that Hammond filed eighteen (18)

16

administrative remedies. (Id. at 10). Defendants explain that of the eighteen (18) administrative remedies filed, twelve (12) of those remedies concerned issues raised in Hammond's Complaint.[18] (Id. at 11).

## 1.  Remedies Filed by Hammond

### a.  Remedy No. 636872

"In Remedy No. 636872 A1, Hammond questioned the response he received in Remedy No. 607647 R2 and submitted it to the General Counsel (reflected by an 'A' next to the remedy number) on April 4, 2011, but it was rejected on April 27, 2011, for not being filed at the proper level (reflected by the 'WRL' on the Sentry printout for rejection status)." (Id. at 12).

In Remedy No. 636872 R1, Hammond once again questioned the response he received in Remedy No. 607647 R2, by filing it with the Regional Director[19] on May 24, 2011. (Id. at 13). This remedy was rejected on May 25, 2011 because Hammond failed to file a BP-9 request with the Warden.[20] (Id.). Sentry records show that Hammond failed to file Remedy 636872 with the Warden. (Id. at 14).

---

[18] "Remedy Nos. 650822 R1, 671303 F1, 682033 R1, 676601 F1, 679248 F1, and 679248 F2 do not concern issues raised in Hammond's complaint, i.e. respectively, did not receive a response to BP-9, property confiscated, requesting protection from various groups of inmates, and personal property missing." (Doc. 36, fn. 2).

[19] Filing with the Regional Director is reflected by an "R" next to the remedy number. (Doc. 36, ¶ 13).

[20] Failure to file a BP-9 request is reflected by "INS" rejection status reason on Sentry printout. (Doc. 36, ¶ 13).

17

### b.    Remedy No. 661590

In Remedy No. 661590 F1, Hammond claimed that medical staff at USP Lewisburg

had improperly discontinued his pain medication Gabapentin. (*Id.* at 15).  This remedy was

submitted to the Warden[21] on October 24, 2011. (*Id.*).  Hammond appealed this remedy to

the Regional Director at Remedy No. 661590 R4.[22] (*Id.* at 16).

The Regional Director denied Hammond's remedy on January 5, 2012 because the

Warden had explained to Hammond why his Gabapentin was discontinued, that Hammond

was prescribed another pain medication for his medical condition, his condition was being

monitored by health services staff, and Hammond had access to sick call. (*Id.* at 18).  The

Regional Director also advised Hammond to appeal to the General Counsel if he was

dissatisfied with the response. (*Id.* at 19).  Sentry records demonstrate that Hammond

failed to appeal this remedy to the General Counsel. (*Id.* at 20).

### c.    Remedy No. 667107

In Remedy No. 667107 F1, Hammond stated that on November 7, 2011, he was

assaulted by a staff member and placed in ambulatory restraints for attempting to express

his safety concerns with his cellmate. (*Id.* at 21).  This remedy was received at the

institution on December 2, 2011. (*Id.*).  The Warden denied this remedy on December 9,

2011 because records indicated that Hammond had attempted to break free from staff while

---

[21] The "F" next to the remedy number reflects that the remedy was submitted to the Warden. (Doc. 36, ¶ 15).

[22] The R4 indicates  that it was the fourth time Hammond had submitted this remedy to the Regional Director. (Doc. 36, ¶ 17).  Remedies Nos. 661590 R1-R3 were rejected. (*Id.*).

being escorted and he attempted to assault staff. (*Id.* at 22). Hammond was placed in ambulatory restraints as a result of his violent behavior. (*Id.*). Hammond was advised that if he was dissatisfied with the response, he should appeal to the Regional Director. (*Id.* at 23). Sentry records reveal that Hammond did not appeal the Warden's response to the Regional Director. (*Id.* at 24).

### d.    Remedy No. 636129

Remedy No. 636129 F1 was filed by Hammond wherein he requested an explanation as to why his psychiatric medications were discontinued. (*Id.* at 25). This remedy was rejected on April 21, 2011 because Hammond had failed to attempt informal resolution prior to submitting his remedy. (*Id.*).

In Remedy No. 636129 F2[23], Hammond again requested an explanation of why his psychiatric medications were discontinued. (*Id.* at 26). This remedy was received on April 25, 2011. (*Id.*). This remedy was denied by the Warden on May 3, 2011 because records revealed that Hammond was seen by the Clinical Director on February 16, 2011, and he showed no signs of mental health issues; his schizophrenia was in remission for some time; and he refused psychiatric medication for 3 consecutive days. (*Id.* at 28). Hammond was advised to appeal to the Regional Director if he was dissatisfied with the response. (*Id.* at 29). Sentry records indicate that Hammond did not appeal. (*Id.* at 30).

---

[23] His second attempt to file Remedy No. 636129. (*Id.* at 27).

19

### e.    Remedy No. 651622

On August 11, 2011, the Warden received Remedy No. 651622 wherein Hammond

claimed he was inappropriately touched in a sexual manner by another inmate for eight

weeks. (*Id.* at 31). The Warden denied the remedy on August 17, 2011 explaining that an

inquiry into his allegation had been conducted, but that Hammond would not be advised of

the outcome. (*Id.* at 32). Hammond was advised if he was dissatisfied he should appeal to

the Regional Director. (*Id.* at 33). Sentry records indicate that Hammond did not appeal

this remedy. (*Id.* at 34).

### f.    Remedy No. 678350[24]

On March 2, 2012, the Warden received Remedy No. 678350 F1 filed by Hammond

wherein he claimed he was assaulted by staff during a use of force. (*Id.* at 35).

## 2.    Exhaustion Arguments

Defendants allege that because Hammond failed to exhaust his administrative

remedies, summary judgment must be granted in their favor. (Doc. 35, p. 3-6). Hammond

alleges that, as far as he knew, he exhausted his "administrative grievance." (Doc. 44, p.

18). He explains that he gave his indigent mail, including his administrative grievance, to

Defendant Brewer to send. (*Id.*). Hammond states that because he did not get a response

within "50 something days according to Program Statement 1316 Section 542 18 on

response time." (*Id.*). He claims that he never received any response from General

Counsel, including whether or not his grievance was rejected or was being looked into. (*Id.*).

Hammond alleges that he talked to Defendant Brewer, asking him about the mail Hammond gave him to send out. (*Id.*). Defendant Brewer told Hammond that before he went on vacation, he gave the mail to one of the other counselors to send out. (*Id.*). Hammond then asked Defendant Brewer to find out if the General Counselor received Hammond's complaint. (*Id.* at 18-19). Defendant Brewer told Hammond "he is not talking to Washington for that." (*Id.* at 19). When Hammond failed to receive an answer or response, he considered it a denial of his administrative grievance.

Hammond notes that the complaint sent out regarded Defendant Brewer and other named defendants in this case. He explains that when an inmate files a grievance against a staff member, that staff member will respond to the matter. Hammond alleges that Defendant Brewer had "first hand knowledge that [Hammond] had made an informal complaint against him. An inmate must show the staff member the legal mail before it go inside the envelope." (sic) (*Id.*). Hammond also notes that this was not the first time Defendant Brewer had destroyed or mishandled Hammond's legal mail.[25] (*Id.*).

---

[24] The Court notes that Plaintiff has attached grievances, including this one, filed well after his lawsuit was filed on February 8, 2012. As explained above, the exhaustion requirement must be met *before* the filing of a lawsuit. As such, we will not consider these after-filed grievances.

[25] Hammond, in support of his exhaustion argument, attaches an Inmate Request to Staff form, which Plaintiff claims shows that Remedy Coordinator N. Nevil admits to a pattern or practice of losing inmates' administrative grievances. (Doc. 44, p. 18). However, a review of this document shows that Nevil does not admit to a pattern or practice of losing inmates' grievances, rather Nevil explains that Hammond's grievance was inadvertently misplaced. (*See* Doc. 45, p. 59). Because it was misplaced, Hammond was informed to attach a copy of the

21

Hammond's filings show that he has offered argument only for the proposition that he exhausted his administrative remedies with respect to his complaints against Defendant Brewer. (See id. at 18-19). A review of the record as a whole shows that the allegations against Defendant Brewer are limited to Plaintiff's complaints regarding the failure of the Defendants to protect Hammond from sexual assault. As such, Hammond admits to his failure to exhaust his administrative remedies with respect to all of his claims, except for Remedy No. 651622.[26] Accordingly, we will grant Defendants' motion for summary judgment on the medical claims, conditions of confinement claim (re: the nail), and the excessive use of force claim surrounding the November 7, 2011 incident for failure of Hammond to exhaust his administrative remedies.

The Court notes that to prove an Eighth Amendment claim based on denial of proper medical care, an inmate must establish that Defendants were deliberately indifferent to his medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Defendants, in support of their motion for summary judgment, attached various medical records showing that Hammond was receiving medical care throughout his time at USP Lewisburg. While Hammond did not always agree with the medical care he received, and while there were some disciplinary actions taken that had an effect on his medical care, i.e. he had to receive his medication on

---

correspondence to his Remedy and his remedy would be accepted as timely. (Id.). Despite Hammond's claims to the contrary, this response does not establish a pattern or practice of losing inmates' grievances at USP Lewisburg.

[26] The Court notes that Hammond never explicitly states what remedy he is referring to, just that it involved Defendant Brewer. (See Doc. 44, 18-19).

22

pill-line as opposed to self-carry, at no time does the record show that Defendants were deliberately indifferent to Hammond's serious medical needs.

The Court notes that the Eighth Amendment does not mandate that prisons be free of discomfort. *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Rather, a prisoner must show that he has been deprived of "the minimal civilized measure of life's necessities," such as food, clothing, shelter, sanitation, medical care, or personal safety. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (citations omitted). To violate the Eighth Amendment, conditions of confinement must be dangerous, intolerable or shockingly substandard. *Riley v. Jeffes,* 777 F.2d 143, 147 (3d Cir.1985); *Inmates of Allegheny Cnty. Jail v. Pierce,* 612 F.2d 754, 757 (3d Cir.1979). A nail sticking out of a cell floor is not dangerous, intolerable, or shockingly substandard.

Eighth Amendment violations typically require the presence of intolerable conditions, far worse than those alleged by Hammond. *See, e.g. McKeithan v. Beard,* 322 Fed. App'x. 194, 202 (3d Cir.2009) (finding objective component of Eighth Amendment claim met where plaintiff was housed next to psychotic inmates who smeared themselves with feces and stood at their cell doors, placed feces in air vents, flooded tier with waste, and banged endlessly on sinks) (*citing Vinning–El v. Long,* 482 F.3d 923, 925 (7th Cir.2007) (recognizing claim where plaintiff described floor covered with water, a broken toilet, feces and blood smeared on the wall, and no mattress); and *McBride v. Deer,* 240 F.3d 1287, 1292 (10th Cir.2001) (upholding Eighth Amendment claim where inmate was forced to

remain in feces-covered cell for three days)); *DeSpain v. Uphoff*, 264 F.3d 965 (10th

Cir.2001) (finding violation of Eighth Amendment where, for thirty-six hours, water overflow

after riot flooded unit to standing depth of four inches, prisoners urinated into the water in

which feces and uneaten food floated, water was nearly even with bottom of food carts,

toilets would not flush, and inmate was afraid to eat); *McCord v. Maggio*, 927 F.2d 844, 848

(5th Cir.1991) (finding Eighth Amendment violation where prisoner was forced to live and

sleep for two years in unlit cell with sewage back up and roach infestation).

The Court notes that to prove an Eighth Amendment claim based on excessive

force, "the core judicial inquiry" is "whether the force was applied in a good-faith effort to

maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v.

MicMillian*, 503 U.S. 1, 7 (1992). Hammond's argument that he was only uncooperative in

an effort to save himself from further harm from his cellmate does not change the fact that

Hammond was uncooperative, and that force had to be used by Defendants to gain

compliance. A review of the record shows that the force used by Defendants on November

7, 2011 was applied in a good-faith effort to maintain or restore discipline because

Hammond had gone limp and was uncooperative with Defendants during transport. There

is nothing to suggest that Defendants used force maliciously and sadistically to cause harm.

Further, we will also grant Defendants' motion for summary judgment for failure of

Hammond to exhaust his administrative remedies as they relate to his failure to protect

claim. Hammond argues that he did exhaust these remedies because he gave Defendant

24

Brewer the complaint to be mailed to the General Counsel. (Doc. 44, p. 18-19). When Hammond failed to receive a response from General Counsel, he assumed he had exhausted his remedies. (Id.). However, a review of the record shows that not only did Hammond's remedy request fail to make it to General Counsel; there is also no evidence in the record to suggest that Hammond appealed the Warden's response to the Regional Director. Hammond fails to address whether he filed his remedy to the Regional Director.

As discussed above, the BOP's administrative remedy procedure consists of a three tier system including an informal request, a request to the Warden, a request to the Regional Director, and a request to General Counsel. See 28 C.F.R. §§ 542.10-542.19. Even if Hammond had sent his complaint to the General Counsel, there is nothing in the record to suggest that he submitted his appeal to the regional director. As such, Hammond has failed to exhaust his administrative remedies in regards to his sexual assault and failure to protect claim.

We will also grant Defendants' motion for summary judgment for Hammond's failure to exhaust his retaliation claims, which is broad and seems to encompass, to one extent or the other, all of the claims Hammond alleges in his Complaint.[27] As discussed above, it is clear Hammond has failed to exhaust any administrative remedy in this case.

---

[27] The Court notes that Defendants consider Plaintiff's retaliation claim to be that he was assaulted by staff due to his filing of grievances. (Doc. 35, p. 16-18). However, a reading of Plaintiff's Complaint alleges that he is being retaliated against by Defendants in a multitude of ways, including having his medicine taken away, not being treated by medical staff, being assaulted by correctional staff, and being placed in cells with unsafe inmates. (See Docs. 1, 44).

Accordingly, we will grant Defendants' motion for summary judgment for Plaintiff's

failure to exhaust his administrative remedies with respect to each of his enumerated

claims. Though we are granting summary judgment in favor of Defendants, for purposes of

completeness, we will separately address Hammond's motion for protective order and

motion for temporary restraining order.[28] (Docs. 61, 72).

## B.    Motion for Protective Order

On April 16, 2013, Hammond filed a motion for protective order. (Doc. 61, 64). In

his motion, Hammond alleges that he was continually being retaliated against by BOP staff

at USP Lewisburg because of his current lawsuit. (Doc. 61, p. 2). He alleges he had been

served "real cold food", he was not being given his diabetic bag at night, and that he found

chewing tobacco in his food. (Id.). Hammond also alleges that he was not being protected

from DC inmates and "well known Bloods." (Id. at 3). Hammond also alleges that his cell

had been searched, resulting in the loss and destruction of his personal property, including

his mail. (Id.). He further alleges that, after receiving surgery on his hand in April, the staff

at USP Lewisburg did not provide him with a bag to put over his arm while he showered.

(Id.). He further alleges continuing issues with his medication. (Id. at 3-4). Finally he

alleges that his money was being taken by the business office and that he was not allowed

to spend his money. (Id. at 4).

---

[28] As Plaintiff has failed to exhaust, we will not consider whether Defendant Brenneman is entitled to statutory immunity; whether Defendants failed to protect Hammond; whether the Defendants used excessive force concerning the sexual assault investigation; whether Defendants Bledsoe, Bahre, Brown, Brewer, Hess, Yohe, Eroh,

It is well recognized that the adjudicatory power of a federal court depends upon "the continuing existence of a live and acute controversy." Steffel v. Thompson, 415 U.S. 452, 459 (1974). "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Id. at 459 n.10 (citations omitted). "Past exposure to illegal conduct is insufficient to sustain a present case or controversy regarding injunctive relief if unaccompanied by continuing, present adverse effects." Rosenberg v. Meese, 622 F. Supp. 1451, 1462 (S.D.N.Y. 1985) (citing O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)). A prisoner's transfer or release from prison moots his claims for injunctive or declaratory relief because he is no longer subject to the conditions he alleges are unconstitutional. Abdul-Akbar v. Watson, 4 F.3d 195, 206-07 (3d Cir. 1993); see also Weaver v. Wilcox, 650 F.2d 22, 27 (3d Cir. 1981) ("[A] prisoner lacks standing to seek injunctive relief if he is no longer subject to the alleged conditions he attempts to challenge.").

It is unclear what Hammond is ultimately asking for in his motion for protective order. Based on the allegations in his motion against USP Lewisburg staff, it appears that Hammond is asking for a motion for protective order against USP Lewisburg staff. On June 20, 2013, Hammond informed this Court that he had been transferred to USP Florence. (Doc. 67). Due to his transfer, it appears Hammond's motion for protective order is now

---

and Raup were personally involved (we note that Raup and Eroh were previously dismissed, see Doc. 47); nor whether any of the Defendants are entitled to qualified immunity.

moot since he is no longer housed at USP Lewisburg. As such, we will dismiss the motion as moot.

## C.    Motion for Temporary Restraining Order

An injunction is an "extraordinary remedy" that is never awarded as of right. *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008). The United States Court of Appeals for the Third Circuit has delineated four (4) factors that a district court must consider when ruling on a motion for a preliminary injunction or temporary restraining order: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured if the court denies the requested relief; (3) whether granting the requested relief will result in even greater harm to the nonmoving party; and (4) whether granting the relief will be in the public interest. *See Gerardi v. Pellulo*, 16 F.3d 1363, 1373 (3d Cir.1994*); Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197–98 (3d Cir.1990). These same factors are used in considering a motion for a temporary restraining order. *See Ride the Ducks, L.L.C. v. Duck Boat Tours, Inc.*, 2005 WL 670302, *4 (E.D.Pa. Mar.21, 2005). The moving party bears the burden of satisfying these factors. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 486 (3d Cir.2000). While each factor need not be established beyond a reasonable doubt, they must combine to show the immediate necessity of injunctive relief. *Stilp v. Contino*, 629 F.Supp.2d 449, 457 (M.D.Pa.2009) (*citing Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir.2002)). Moreover, "[a]s these elements suggest, there must be a 'relationship between the injury

claimed in the party's motion and the conduct asserted in the complaint.'" *Ball v. Famiglio*, 396 Fed. Appx. 836, 837 (3d Cir.2010) (*quoting Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir.1994)).

Plaintiff's motion concerns mistreatment he alleges to be receiving while at USP Florence, including being placed in administrative segregation, not being protected, and issues he is having with his mail. (Doc. 72). The Court notes that it is not in the Middle District of Pennsylvania. As such, we have no jurisdiction over USP Florence or the allegations in this motion. As such, we will deny Plaintiff's motion.

However, the Court further notes that, beyond jurisdictional issues, Plaintiff has failed to show a relationship between the injuries he claims now and the Complaint with the Court beyond a broad allegation that the his mistreatment at USP Florence stems from the filing of this Complaint and the filing of grievances against the medical department at USP Florence. We find that Plaintiff's broad allegation that his mistreatment in USP Florence is associated with his current Complaint is at best tenuous. Plaintiff's allegations in his motion for emergency temporary restraining order specifically discusses various alleged mistreatments that occurred while at USP Florence, with nothing tying the mistreatments to his current Complaint beyond his broad allegation that they are connected.

If Plaintiff believes that his rights are being violated in a way that requires immediate attention, he should file a proper motion in the district in which USP Florence is located, the United States District Court for the District of Colorado.

## V. Conclusion

For the reasons discussed above, we will grant Defendants' motion for summary judgment (Doc. 32) because Hammond has failed to exhaust his administrative remedies. Additionally, the motion for protective order filed by Plaintiff on April 17, 2013 (Doc. 61) will be dismissed as moot and the motion for emergency temporary restraining order (Doc. 72) filed on October 1, 2013 will be denied.

Robert D. Mariani
United States District Judge